IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WBY, INC. d/b/a FOLLIES, STEVE          :
YOUNGELSON, and JOSHUA                  :
SCHINDLER ,
                                        :
      Plaintiffs,                       :
                                        :
v.                                      :     CIVIL ACTION NO.
                                        :     1:14-CV-0253-LMM
                                        :
DEKALB COUNTY, GEORGIA,                 :
CEDRIC ALEXANDER, JEFFERY               :
RUTLAND, HUBERT BRANNON,                :
CURTIS A. WILLIAMS, EMANUEL             :
McCOWN, and STEPHEN RAPIER,             :
                                        :
                                        :
      Defendants.                       :

## ORDER

This case comes before the Court on Defendants' Motions for Summary

Judgment [72, 73]. For the reasons explained in this Order, Defendants' Motions

for Summary Judgment are **GRANTED** in part and **DENIED** in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

The case before the Court arises from a series of administrative inspections

of adult entertainment establishments conducted by the DeKalb County Police

Department ("DKPD") in April of 2013. In particular, Plaintiffs complain that the

---

[1] The facts in this section are construed in a light most favorable to Plaintiff unless
stated otherwise.

administrative search performed on Plaintiff WBY, Inc. d/b/a/ Follies ("Follies")

exceeded the scope of a warrantless administrative search.

Follies is an adult entertainment club located on Buford Highway. Dkt. No.

[80] at 4. It is part-owned by Plaintiff Youngelson and has been in operation for

more than twenty years. Id.

DeKalb County entered into a Settlement Agreement with Follies in May of

2007, granting "non-conforming use" status to the club. Dkt. No. [80-3] at 25.

Non-conforming use status allows Follies to operate outside of several DeKalb

County ordinances. To maintain non-conforming use status, Follies pays

$100,000 in fees per year, over and above regular licensing fees. Dkt. No. [80] at

4. Even with the agreement, at the time of the raid, Follies remained subject to a

number of DeKalb County ordinances.[2] Follies was subject to ordinance § 15-405

requiring all employees to secure a permit to work in an adult entertainment

establishment. Id. at 4-5. Follies was subject to DeKalb County ordinance § 15-

420, allowing police officers to enter Follies for administrative searches to ensure

compliance with the permit requirements. DEKALB CO., GA., CODE art. XII, § 15-

420. Lastly, Follies was subject to ordinance § 4-26, allowing similar inspections

for alcohol permits. DEKALB CO., GA., CODE art. II, § 4-26.

DeKalb County officials have performed such inspections numerous times

in the past. Dkt. No. [80] at 5. On those occasions, 4-5 officers would enter the

---

[2] Follies is no longer subject to DeKalb County ordinances because its current
location was annexed by the City of Chamblee sometime after the raid, such that
the ordinances no longer apply. See Dkt. No. [72-1] at 33 n. 4.

club and inspect dancers' permits in groups of four to five dancers. Id. Officers

would perform the inspection in the "backstage" of the club, away from patrons.

Id. at 6. Uniformed officers would stand by the front and back entrance to ensure

that no dancer tried to leave. Id. Dancers would continue to dance while the

permit checks occurred. Id.[3]

　　　In January of 2013, Defendant Williams supervised the VICE unit at

DKPD. Dkt. No. [80-2] ¶ 26. Williams met with Defendant Alexander, Chief of

DKPD, and proposed that VICE conduct a series of unannounced administrative

searches on adult entertainment establishments. Id. at ¶ 27. Specifically,

Williams told Alexander that there were complaints of criminal activity at the

adult entertainment establishments that required further investigation.[4] Id. at ¶

28. Alexander agreed to Williams' proposal. Id. at ¶ 29. He instructed Williams to

look into the criminal complaints and to ensure the establishments were in

compliance with the county ordinances. Id. Additionally, Alexander was aware of

and approved the tactical plan and scope of the raids. Id. at ¶ 38.

---

[3] Defendants object to the facts laid out in this paragraph as "immaterial." Dkt.
No. [88] at 9. However, Defendants use these facts in their brief to show a
repeated custom of constitutional administrative searches. See Dkt. No. [72-1] at
21-22 ("[o]n many prior occasions, DeKalb county officials conducted permit
checks . . . without a show of force and without disrupting the business.").
Because Defendants rely on these very facts to make out their own argument, the
Court overrules their objection.

[4] Though the facts show Defendants were interested in surveilling Follies due to
alleged criminal activity, Plaintiffs argue that the criminal activity did not
influence Defendants' tactical decisions in preparation for and during the raid.
See supra n. 6.

Specific to Follies, DKPD had received one complaint from a disgruntled patron. Id. at ¶ 30. In that complaint, the patron said he was "kicked out of the club and was threatened." Id. Other than this one patron's complaint, neither Defendant Brannon nor Williams recalled any other specific complaints about Follies.[5] Id. at ¶ 31. Defendant Rutland, however, did recall vague complaints about drugs and prostitution occurring inside Follies. Dkt. No. [72-8] at 3.

While investigating Follies, Defendants sent in undercover officers. Dkt. No. [80-2] ¶ 34. While undercover, an officer was allegedly approached by a dancer who offered to participate in sexual activity in exchange for money. Id.

---

[5] At this point in the narrative, Defendants allege there were many more complaints regarding Follies' criminal activity. Specifically, Defendants point to a list of 21 calls made to 911 in about a month time period. Dkt No. [72-2] ¶ 2. Plaintiffs object to the inclusion of this list because Defendants failed to provide the list during discovery in violation of Federal Rule of Civil Procedure 26(a)(1)(A)(ii). Dkt. No. [80-1] at 2. According to Plaintiffs, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Id. at 4 (quoting In re Delta/Air Tran Baggage Fee Antitrust Lit., 846 F. Supp. 2d 1335, 1357 (N.D. Ga. 2012)). Plaintiffs argue that it was not substantially justified and it would be harmful to include the evidence at this stage in the litigation.

Defendants make little argument as to how their actions were justified or why their actions are harmless. They do argue, however, that the harm would be minimal as there is ample evidence on the record, outside the list, to demonstrate that "criminal activity and other circumstances necessitated a robust police presence" during the raid. Dkt. No. [88] at 4.

The Court agrees with Plaintiffs. Defendants have not provided a substantially justified reason for their failure to produce and Plaintiff will be harmed if the Court considers the evidence without Plaintiffs having had a chance to depose or otherwise investigate the complainants. As such, the Court will not consider the list for purposes of Defendants' motions. Additionally, the Court will not consider affidavit testimony from Defendant Brannon that specifically relies on the list.

Additionally, officers witnessed security guards, hired by Follies, carrying AR-15 rifles. [6] Id. at ¶ 35.

In April of 2013, after investigating the various adult establishments, Defendant Williams began a series of administrative search "raids." Id. at ¶ 42. These raids were part of VICE Unit's "aggressive enforcement action" against adult establishments for permit violations. Id. Williams raided various adult establishments in DeKalb County, including  Pin Ups, Shooters Alley, Strokers, Club Blaze, Da Bomb Platinum, and, on April 19, 2013, Follies. Id. at ¶¶ 43-47.

During the Follies raid, between 30-40 police officers entered the club, many wearing army fatigues, ski masks, and visibly armed with handguns. Id. at ¶ 48. Upon entering, one officer took over the public address system and stated, "this is a raid, no one move," or words to that effect. Id. at ¶ 50. Customers were ordered to sit in certain locations and were initially not allowed to move. Id. at ¶ 51. All 55 of Follies' dancers were ordered off the stage and into the dressing

---

[6] The Court notes that it is currently disputed whether these various incidents affected Defendants' approach to the subsequent raid. In deposition testimony, many Defendants said that the criminal activity did not affect their decision to use more officers and more forceful tactics. Dkt. No. [65-5] at 80 ("Q. No, there was nothing particular about [Follies] that would cause you to have more police officers than you would in another location? A. No, sir."). However, in subsequent affidavits, Defendants claim that the criminal activity *did* affect their tactical decisions. Dkt. No. [72-11] ¶ 12 ("[the criminal activity] suggests that Follies' patrons and security posed a significant safety threat to officers and inspectors necessitating a strong police presence."). Because this is conflicting testimony, and the Court must construe the facts in a light most favorable to the non-moving party, the Court finds, for the purposes of summary judgment, that the security threat did *not* affect Defendants' tactical decisions. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

room. Id. at ¶¶ 52-53. While in the dressing room, each dancer was photographed next to a whiteboard with their legal names and aliases. Id. at ¶ 60. Video footage recorded by DKPD shows an officer opening closed doors to storage closets, rummaging through boxes, and searching the bathroom, kitchen, and storage rooms. Id. at ¶ 58.

Before the raid began, Plaintiff Youngelson was working in his office. Id. at ¶ 66. When the commotion began, Youngelson walked out of his office, approached the nearest officer, and demanded to know why police were raiding his business. Id. ¶ 67. He also asked if they had a search warrant to do so. Id. Defendant Rapier told Youngelson to "shut up." Id. at ¶ 68. When Youngelson asked again, Rapier grabbed him and slammed him against a wall. Id. at ¶ 69. Rapier pulled Youngelson's arm behind his back, up, and away from his body, causing significant pain. Id. at ¶ 70. Youngelson was eventually handcuffed with a ziptie. Id. at ¶ 73. He was then escorted out of the building with his arms held up and away from his body. Id. at ¶ 74.

While being escorted out of the club, Rapier pushed Youngelson headfirst into the first set of double doors leading out of the club. Id. at ¶ 75. Youngelson was then pushed headfirst into the metal detector near the entrance of the club. Id. at ¶ 76. Once outside, Rapier placed Youngelson in a chair and prevented him from leaving. Id. at ¶¶ 77-78. According to a report prepared after the incident, Youngelson was detained for disorderly conduct. Id. at ¶ 81. However, after the

raid ended, Rapier released Youngelson and no criminal charges were filed against him. Id. at ¶¶ 79-80.

Plaintiff Schindler was similarly arrested for disorderly conduct during the raid. Id. at ¶ 97. Schindler works for a valet company which had contracted with Follies for valet services. Id. at ¶ 83. Moments after the raid began, Schindler was walking back towards the valet stand. Id. at ¶ 84. Schindler noticed police officers filing into Follies. Id. at ¶ 85. While Schindler was approaching Follies, Rutland walked up to him and yelled, "What are you doing? Back down!" Id. at ¶ 86.

Schindler informed Rutland that he worked at Follies and that he was just walking back to the valet stand. Id. at ¶ 87. Rutland continued to shout, "back down" as he approached within inches of Schindler's face. Id. at ¶ 88. Schindler did not back down immediately but eventually stepped backwards and raised his arms to comply. Id. at ¶¶ 89-90. At that point, Defendant Brannon approached Schindler from behind, grabbed one arm, twisted it behind his back and took him to the ground. Id.¶ 92. Schindler was handcuffed and detained for the duration of the raid. Id. at ¶ 94. He was then transported to the DeKalb County Detention Center where he remained in custody until approximately 12:00 p.m. on April 20th. Id. at ¶¶ 99-100.

Schindler appeared for his trial date on June 20, 2013. Id. at ¶ 102. However, neither officer appeared for the trial and the charges were dismissed for want of prosecution. Id. at ¶ 103.

Follies, Youngelson, and Schindler brought the instant action on December 9, 2014. They allege eleven different claims against Defendants.[7] Follies asserts two separate claims under 42 U.S.C. § 1983. They are (1) unlawful search and seizure in violation of the Fourth Amendment against all Defendants, and (2) prior restraint in violation of the First Amendment against all Defendants. Plaintiff Youngelson asserts four claims under both § 1983 and various state laws. They are (1) excessive force in violation of the Fourth Amendment against Rapier, (2) false imprisonment in violation of the Fourth Amendment against Rapier, Brannon, and Williams, (3) false imprisonment in violation of O.C.G.A. § 51-7-20 against Williams, Brannon and Rapier, and (4) assault and battery in violation of O.C.G.A. § 51-1-13 and § 51-1-14 against Rapier.

Plaintiff Schindler brings five claims under both § 1983 and various state laws. They are (1) excessive force in violation of the Fourth Amendment against Brannon and Rutland,[8] (2) false arrest in violation of the Fourth Amendment

---

[7] Plaintiffs had asserted a twelfth claim, arguing the administrative inspection ordinance was unconstitutional. However, they have withdrawn that claim as the ordinance no longer applies. See *infra* footnote 2.

[8] There has been some confusion as to which claims have been brought against which Defendants. Initially, Plaintiff Schindler brought the excessive force claim against Rutland and McCown. However, in the Amended Complaint, Plaintiff swapped McCown for Brannon. Though it appears that Plaintiffs have dropped McCown from the claim, they continue to use his name in places where it would seem they meant to use Brannon's name. See Dkt. No. [56] ¶ 101-110. However, the Court sees this as scrivener's error as evidenced by Plaintiffs' brief in opposition to summary judgment. In the section listing the different claims, Plaintiffs specifically say that Schindler's five claims are only against Rutland and Brannon. Dkt. No. [80] at 2. Additionally, in the fact section describing the alleged excessive force, Plaintiffs only refer to Rutland Brannon. Id. at 14, 32

against Brannon and Rutland, (3) false imprisonment in violation of O.C.G.A §

51-1-20 against Rutland and Brannon, (4) assault and battery in violation of

O.C.G.A. § 51-1-13 and § 51-1-14 against Brannon and Rutland, and (5) malicious

prosecution against Rutland.

Defendants DeKalb County, Williams, Brannon, McCown, Rapier and

Alexander filed a motion for summary judgment as to all claims. Dkt. No. [72].

Defendant Rutland filed his own motion for summary judgment as to all claims.

Dkt. No. [73].

## II.   LEGAL STANDARD—MOTION FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute of any

material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). A factual dispute is genuine if the evidence would allow a

reasonable jury to find for the moving party. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim

under the applicable substantive law which might affect the outcome of the case."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden to show the Court, by reference

to material in the record, that there is no genuine dispute as to any material fact

that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256,

_____

("Rutland and Brannon used excessive force when they arrested Schindler"). As
such, the Court will proceed with the understanding that Schindler means to
bring his excessive force claim against Brannon and Rutland only.

1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

The moving party's burden is discharged merely by "'showing'—that is, pointing

out to the district court—that there is an absence of evidence to support [an

essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325.

In determining whether the moving party has met this burden, the district court

must view the evidence and all factual inferences in the light most favorable to

the party opposing the motion. Johnson, 74 F.3d at 1090.

Once the moving party has adequately supported its motion, the non-

movant then has the burden of showing that summary judgment is improper by

coming forward with specific facts showing a genuine dispute. Matsushita Elc.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine

[dispute] for trial" when the record as a whole could not lead a rational trier of

fact to find for the nonmoving party. Id. (citations omitted). All reasonable

doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City

of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.  DISCUSSION

### a.  Follies' Claims

As mentioned above, Follies brings two claims arising under § 1983 against

all Defendants. They are (1) unreasonable search and seizure in violation of the

Fourth Amendment, and (2) prior restraint in violation of the First Amendment.

The Court will go through each claim in turn.

### i.  *Unreasonable Search and Seizure*

Follies claims that the April 19th raid amounted to an unreasonable search and seizure of Follies' property. In particular, Follies argues that the raid exceeded the scope of a warrantless administrative search in violation of its Fourth Amendment rights.

Defendants, in turn, move to dismiss Follies' unreasonable search and seizure claim. First, Defendants argue that the individual Defendants are protected from suit on qualified immunity grounds. Second, Defendants argue that DeKalb County is protected from suit under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

### 1.  *Qualified Immunity*

The qualified immunity analysis is a two-pronged approach. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Courts must determine (1) if there was a constitutional violation, and (2) whether that violation was clearly established. Id.

### a.  *Was there a constitutional violation?*

The Court will first determine if Defendants' actions amount to a Fourth Amendment violation. Though the Fourth Amendment prohibits unreasonable search and seizure of commercial property, the expectation of privacy is "less than[] a similar expectation in an individual's home." New York v. Burger, 482 U.S. 691, 699-700 (1987). "This expectation is particularly attenuated in commercial property employed in 'closely regulated' industries." Id. at 700. Adult

entertainment establishments, like Follies, are considered closely regulated industries. Colonnade Catering Corp. v. U.S., 397 U.S. 72, 77 (1970). The Supreme Court has held that surprise administrative searches of these closely regulated industries are valid even without a warrant. Burger, 482 U.S. at 702.

Though administrative searches may be warrantless, "the scope and execution . . . must be reasonable in order to be constitutional." Bruce v. Beary, 498 F.3d 1232, 1243-44 (11th Cir. 2007) (citing Donovan v. Dewey, 452 U.S. 594, 598-99 (1981)) ("[A]dministrative searches are an exception to the Fourth Amendment's warrant requirement, but they are not an exception to the Fourth Amendment's requirement for reasonableness."). See Indianapolis v. Edmond, 531 U.S. 32, 37 (2000) ("We have allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropriately limited."). Therefore, the Court must determine whether the scope and execution of the Follies search was reasonable.

An administrative search is unreasonable if it is excessive in execution. Bruce, 498 F.3d at 1243-44 (citing Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11th Cir. 1995)) ("We have previously invalidated a similar administrative search, holding that it was unreasonably excessive in execution."). In deciding whether the Follies search was excessive in execution, the Court looks to the two

Eleventh Circuit cases on point. <u>Bruce</u>, 498 F.3d at 1243-44; <u>Crosby v. Paulk</u>, 187 F.3d 1339 (11th Cir. 1999).[9]

The first of the two cases, <u>Crosby</u>, dealt with the administrative search of a popular nightclub. <u>Crosby</u>, 187 F.3d at 1348-49. In that case, the defendant officers conducted a search of the premises after receiving numerous complaints of underage drinking. <u>Id</u>. The defendants sent in 40 law enforcement officers to check identification for nearly 400 patrons and had officers posted at the exits to ensure that no patrons left the premises before they were searched. <u>Id</u>. That particular search resulted in 70 arrests and 54 convictions for underage drinking. <u>Id</u>. at 1350 n. 14.

The Eleventh Circuit found that the search was not excessive. <u>Id</u>. at 1348-49. In particular, it reasoned that (1) the presence of 40 law enforcement officers was proportionate to the officers' needs, (2) the officers did not carry heavy arms or point them at employees or patrons, (3) the officers were accompanied by code compliance agents to enforce local and state law, and (4) the operation resulted in dozens of arrests. <u>Id</u>. at 1348-49. As a result, the inspection was not unreasonable.

---

[9] While Plaintiffs argue that <u>Swint</u> is also on point, the Court finds it is not *directly* on point. In that case, the driving question was whether the defendants had arguable probable cause to conduct the search. <u>Swint</u>, 51 F.3d at 996. Though the officers in <u>Swint</u> checked some permits while conducting the raid, the main purpose of the raid was to investigate criminal activity, taking it out of the realm of a warrantless administrative search. <u>Crosby</u>, 187 F.3d at 1349 n. 14 ("the *Swint* court also concluded that no reasonable officer could have believed that the two raids were legitimate, warrantless administrative searches.").

13

Conversely, in <u>Bruce</u>, the Eleventh Circuit found that the administrative search at issue was excessive in execution. <u>Bruce</u>, 498 F.3d at 1247. In that case, 20 officers were deployed to inspect an auto salvage shop for possible ordinance violations. <u>Id</u>. at 1244. The court was particularly troubled by the way in which the defendants conducted the search. Specifically, the court found it was an unreasonable search because (1) the officers arrived in unmarked cars and blocked all exits, (2) 20 officers were involved, including SWAT officers, to investigate VIN discrepancies, (3) officers were armed with automatic weapons and sidearms, (4) officers ordered all employees to line up along a fence, (4) an officer pointed a shotgun at an employee, (5) officers searched areas of the property not relevant to their administrative purpose, and (6) the search lasted eight hours. <u>Bruce</u>, 498 F.3d at 1244.

Defendants argue that their actions resemble the facts in <u>Crosby</u> rather than the facts in <u>Bruce</u>. However, the Court finds that the facts in this case are less similar to <u>Crosby</u>. For instance, the officers in <u>Crosby</u> were investigating numerous documented complaints of underage drinking. <u>Id</u>. at 1349. In this case, the undisputed facts show there were actually very few complaints concerning Follies.[10] Additionally, the officers in <u>Crosby</u> had to check identification for nearly 400 patrons, justifying the increased police presence. <u>Id</u>. In contrast, Defendants were only there to check employee permits. According to the facts, they checked 55 dancers' permits and a few bartender permits. This number pales in

---

[10] See the discussion in footnote 4, *infra*, concerning the 911 calls.

14

comparison to the amount of people searched in <u>Crosby</u>. And while Defendants argue that they needed additional officers due to alleged security threats, Plaintiffs' asserted facts show that Defendants did *not* consider those threats when putting together the task force and, yet, utilized a SWAT team to implement the search.[11]

Next, the <u>Crosby</u> raid resulted in 70 arrests and 54 convictions for underage drinking. <u>Id</u>. at 1350 n. 14. In this case, Plaintiff Schindler was arrested but never convicted and officers issued citations to two employees for violation of the DeKalb Alcohol Code, to three dancers for violations of the adult entertainment code, and to Plaintiff Youngelson for selling cigarettes illegally and lacking a business license. Again, this number pales in comparison to the numbers in <u>Crosby</u>.

In contrast, the facts in this case more closely resemble the facts in <u>Bruce</u>. Specifically, like the defendants in <u>Bruce</u>, Defendants utilized a SWAT team to inspect ordinance violations and searched areas unrelated to the inspection. Like in <u>Bruce</u>, the number of officers present in the search appears excessive based on Plaintiff's alleged facts. And similar to the officers in <u>Bruce</u>, the officers in this case were armed with sidearms and allegedly intimidated employees and patrons. As such, the Court finds there is a question of fact as to whether Defendants

---

[11] The Court also notes that the defendants in <u>Crosby</u> did *not* use a SWAT team to effectuate their reasonable search.

violated Follies' Fourth Amendment right against unreasonable search and seizure.

### b. Was the violation clearly established?

The next prong in the analysis asks the Court to determine that, even if there were a constitutional violation, was that violation clearly established. For this step the Court must look to Supreme Court and the Eleventh Circuit precedent to establish if the law, at the time of the violation, gave "fair and clear warning" to a reasonable officer that his or her actions were unconstitutional. Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011).

Follies relies on Bruce to show that Defendants violated clearly established law.[12] Defendants, however, deny that Bruce clearly establishes the violation. Specifically, Defendants argue that, in recent years, the Eleventh Circuit has retreated or attempted to retreat from its holding to such an extent that it can no longer constitute clearly established law. See Indigo Room, Inc. v. City of Fort Myers, 589 Fed. App'x 938 (11th Cir. 2014); Berry v. Leslie, 767 F.3d 1144 (11th Cir. 2014); Berry v. Orange County, 771 F.3d 1316 (11th Cir. 2014). The Court agrees with this argument.

In Leslie, the Eleventh Circuit attempted to affirm its prior holding in Swint and Bruce. Specifically, the court wrote, "[w]e first held nineteen years ago

---

[12] As mentioned in footnote 9, Plaintiff also relies on Swint to demonstrate that the violation was clearly established. However, because Swint dealt with questions of probable cause rather than whether an administrative search was reasonable, the Court finds it does not help determine whether the instant violation was clearly established.

that conducting a run-of-the-mill administrative inspection as though it is a criminal raid, when no indication exists that safety will be threatened by the inspection, violates clearly established Fourth Amendment rights . . . today we repeat that same message once again" Leslie, 767 F.3d at 1146 (citing Swint, 51 F.3d at 988; Bruce, 498 F.3d at 1232). However, less than two months later, the Eleventh Circuit vacated its own holding. See Orange County, 771 F.3d at 1316. Because the Eleventh Circuit has not handed down a new ruling, this Court concludes the law on this issue is not clearly established.[13]

As such, the Court cannot say that the administrative search violated clearly established law. Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the individual Defendants on Follies' Fourth Amendment claim.[14]

### 2. *Monell Liability*

Next, Defendants argue DeKalb County is immune from Follies' Fourth Amendment claim because Follies cannot demonstrate Monell liability. Specifically, Defendants rely on the Supreme Court case, Monell v. Dep't of Soc. Servs., that held a county can only be liable under § 1983 when its official policy

---

[13] While Bruce is not clearly established law for the purposes of qualified immunity, the Court can still use its reasoning and facts to determine whether Defendants violated the Fourth Amendment, as the case is still binding precedent.

[14] Follies goes on to argue that Defendant Alexander, Chief of DKPD, is liable even though he did not personally participate in the raid. However, the Court need not discuss whether Alexander would or would not be liable despite his non-presence because the Court has found that all individual Defendants are immune on this claim through qualified immunity.

caused the constitutional violation. <u>Monell</u>, 436 U.S. at 694. To prove an official policy, a plaintiff must identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county. <u>Id</u>. Importantly, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability." <u>Craig v. Floyd Cty., Ga.</u>, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting <u>City of Okla. City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985)).

Defendants first argue that Follies cannot point to any officially promulgated policy and therefore must show an unofficial custom or practice. To do so, Follies must show a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." <u>Brown v. City of Ft. Lauderdale</u>, 923 F.2d 1474, 1481 (11th Cir. 1991).

Defendants then argue that Follies fails to show any repeated or permanent unconstitutional policy regarding adult nightclubs as to constitute a custom or practice. In fact, according to Defendants, Follies' evidence proves the opposite: that there was a custom or practice of *constitutional* administrative searches. Defendants point to the undisputed fact that "[o]n many prior occasions, DeKalb county officials conducted permit checks . . . without a show of force and without disrupting the business." Dkt. No. [72-1] at 21-22. Defendants argue that, if anything, the raid in question was unique and therefore does not show a custom or practice. <u>Id</u>. at 22.

To counter this argument, Follies does not rely on the single raid as proof of a larger policy. Instead, Follies argues that it was the overall enforcement plan, ratified by Defendant Alexander, that shows an unofficial custom or practice. In particular, Follies points to the conversations between Defendant Alexander and Defendant Williams wherein Williams told Alexander what he planned to do and Alexander approved those decisions.

According to Follies, because Alexander ratified the unconstitutional behavior, the Court may impose <u>Monell</u> liability. As support for this argument, Follies relies on <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112 (1988), where the Supreme Court held that if an authorized policymaker approves "a subordinate's decision and the basis for it, [the policymaker's] ratification would be chargeable to the municipality because [the policymaker's] decision is final." <u>Id</u>. at 127. Follies argues that, because Alexander is the final policymaker for the DKPD, his ratification of each adult establishment raid in the month of April is chargeable to DeKalb County.

Defendants do not deny that Alexander is the final policymaking authority for DKPD. Their only counterargument is that, even if Alexander ratified the behavior, the raid in question was not unconstitutional. However, the Court has already found that a question of fact remains as to whether the raid was unconstitutional. Therefore, the Court **DENIES** Defendants' Motion for Summary Judgment as to DeKalb County on Follies' Fourth Amendment claim.

### ii.  Prior Restraint

Follies claims that the April 19th raid amounted to a prior restraint in violation of Follies' First Amendment rights. In particular, Follies argues that by preventing the dancers from dancing for two hours during the raid, Defendants violated Follies' First Amendment right to free speech.

Defendants, in turn, move to dismiss Follies' prior restraint claim as not properly alleging an unconstitutional prior restraint.[15] While the First Amendment protects nude dancing, that protection is limited. City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) ("[N]ude dancing . . . is expressive conduct, although we think it falls only within the outer ambit of the First Amendment's protection."). And because First Amendment protections are not absolute, prior restraints on expressive conduct are not per se unconstitutional. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558 (1975).

The parties stipulate that Defendants' actions constitute a prior restraint. However, Defendants argue that their actions do not amount to an *unconstitutional* prior restraint. In particular, Defendants rely on Alexis, Inc. v. Pinellas Cty., Fla., 194 F. Supp. 2d 1336 (M.D. Fla. 2002), *aff'd*, 88 F. App'x 384 (11th Cir. 2003), for the notion that temporarily interrupting nude dancing in the

---

[15] Defendants claim that the individual Defendants are protected from suit on qualified immunity grounds. Second, Defendants claim that DeKalb County is protected from suit under Monell. However, because the Court finds that there was no underlying violation, it need not analyze Defendants' defenses.

course of a proper law enforcement action is not an unconstitutional prior restraint. Id. at 1348.

In Alexis, the defendants conducted undercover surveillance on adult entertainment establishments resulting in raids and mass arrests of dancers. Id. at 1340. Though, the officers arrested dancers without obtaining any warrants, they only arrested those dancers who had violated the law in the presence of an officer. Id. at 1347.

The plaintiff sued the officers and Sheriff, claiming prior restraint in violation of the First Amendment. Id. In determining whether the prior restraint was unconstitutional, the court recognized that a prior restraint on nude dancing is permissible if there are other procedural safeguards in place to prevent censorship by law enforcement. Id. at 1347 (citing to Southeastern Promotion, 420 U.S. at 558). In particular, the court found:

> [O]nce the dancers were released, they were immediately free to again engage in their dance activities, and . . . those dancers not arrested were left by the deputies to continue the dance. Although the plaintiff businesses temporarily lost the services of the arrested dancers . . . they were not closed down by the arrests, and significantly, none were prohibited from continuing to offer dance performances by other dancers. . . In sum, the court concludes that the actions of the Sheriff's Department in arresting dancers for whom there was probable cause for arrest did not present an impermissible prior restraint in violation of the First Amendment.

Id. at 1348.

The Court finds the reasoning in Alexis persuasive. In Alexis the court said that, because the officers had probable cause to interrupt and arrest the nude

21

dancers, the prior restraint was not unconstitutional. Id. at 1347. In this case, although there are potential issues with probable cause and the reasonableness of the raid, the underlying act of interrupting a nude dancer to perform a permit inspection does not create an unconstitutional prior restraint. See generally id. ("Regardless of the quantum of protection afforded the dancers by the First Amendment, they may not claim to be insulated from punitive actions against their misconduct merely because it occurred during a dance.").

Put in other words, had the Defendants conducted a normal, run-of-the-mill inspection, they could have interrupted any dancer's performance to verify her permit. Though this particular inspection may have exceeded the typical administrative inspection, it does not change the fact that the officers are legally permitted to interrupt the performances in a manner in which the performances were interrupted here. As such, the Court **GRANTS** Defendants' Motions for Summary Judgment as to all Defendants for Follies' prior restraint claim.

### b. Youngelson and Schindler's Claims

Because Plaintiff Youngelson and Plaintiff Schindler's claims are similar, the Court will discuss them together. As mentioned *infra*, Plaintiffs bring both federal and state law claims.

### i. Federal Claims

Both Plaintiffs bring a cause of action against Defendants Rapier, Rutland, and Brannon for excessive force in violation of the Fourth Amendment. Youngelson brings a claim for false imprisonment in violation of the Fourth

Amendment against Rapier, Brannon, and Williams. Schindler brings a similar claim against Brannon and Rutland for false arrest in violation of the Fourth Amendment. The Court will analyze Plaintiffs' excessive force claims together as they present the same issues. The Court will also analyze Youngelson's false imprisonment claim with Schindler's false arrest claim as they present nearly identical issues.

### 1. Excessive Force

In the Amended Complaint, Youngelson claims that Rapier, acting under color of law, deprived him of his Fourth Amendment right against excessive force. In particular, Youngelson alleges that Rapier threw him up against a wall, pulled his arm back away from his body, handcuffed him, and proceeded to escort him out of the club. While escorting him out, Rapier slammed him, head first, into the first set of double doors and then pushed him into the club's metal detector. In his deposition, Youngelson says he received bruises on his shoulder and bruises on his stomach.

Schindler claims that Rutland and Brannon, acting under color of law, deprived him of his Fourth Amendment right against excessive force when they threw him to the ground during his arrest. Schindler also admits that he received only minor injuries.

Defendants claim that, even if they violated Plaintiffs' right against excessive force, they are immune from suit through qualified immunity. In particular, they claim the violations were not clearly established because, in

executing the arrests, Defendants used only *de minimis* force. Importantly, Plaintiffs do not refute this argument.

As discussed above, there are two prongs to the qualified immunity analysis. <u>Pearson</u>, 555 U.S. at 236 (defining the two-pronged analysis as (1) whether there was a constitutional violating, and (2) whether that violation was clearly established). The Court need not first determine whether a constitutional violation actually occurred. <u>Id</u>. at 242. Instead, the Court may first determine, at its discretion, if the alleged conduct was an actual violation. <u>Id</u>.

In this instance, the Court finds that the violations were not clearly established. The Eleventh Circuit "has established that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1257 (11th Cir. 2000). See also <u>Jones v. City of Dothan</u>, 121 F.3d 1456, 1460 (11th Cir. 1997) ("the excessive force standard would not inevitably lead an official in the offier's position to conclude that the force was unlawful since the amount of force was minimal); <u>Gold v. City of Miami</u>, 121 F.3d 1442 (11th Cir. 1997); <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552 (11th Cir. 1993). As such, the Court **GRANTS** Defendants' Motions for Summary Judgment for Youngelson and Schindler's excessive force claims.

### 2. *False Imprisonment/False Arrest*

Youngelson brings a claim for false imprisonment in violation of the Fourth Amendment while Schindler brings a claim for false arrest in violation of

the Fourth Amendment. Though they present very similar issues, there are a few slight differences.

For Youngelson to prevail on his false imprisonment claim he "must meet the elements of common law false imprisonment and establish that the imprisonment resulted in a violation of due process rights under the Fourteenth Amendment." Ortega v. Christian, 85 F.3d 1521, 1526 (11th Cir. 1996) (citing Cannon v. Macon County, 1 F.3d 1558, 1565 (11th Cir. 1993)). The elements of common law false imprisonment are (1) an intent to confine, (2) an act resulting in confinement, and (3) the victim's awareness of confinement. Campbell v. Johnson, 586 F.3d 835, 840 (11th Cir. 2009). A confinement violates the Fourteenth amendment if it is unlawful. See Ortega, 85 F.3d at 1526. A confinement pursuant to arrest is unlawful if the arresting officer lacks probable cause. Id. ("Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest.") (citing Groman v. Township of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995)).

Therefore, Youngelson must show that (1) he was detained, and (2) the arresting officer lacked probable cause to make the arrest. See id. Because it is undisputed that Defendants detained Youngelson, Youngelson need only show that Defendants lacked probable cause to detain him.[16] Specifically, Youngelson

---

[16] Defendants, relying on the Georgia statute for false arrest, argue that Youngelson must also prove that Defendants acted maliciously. However, for a §

must show that Defendants lacked probable cause to detain him for disorderly conduct.[17]

Lack of probable cause exists when "the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused." O.C.G.A. § 51-7-3. Whether a defendant had probable cause is a question for the jury. Kingsland v. City of Miami, 382 F.3d 1220, 1235 (11th Cir. 2004) ("[W]here, as here, the evidence is in dispute, the . . . want of probable cause [is a] question of fact for the jury."). However, "what facts and circumstances amount to probable cause is a pure question of law." Mohamud v. Wachovia Corp., 580 S.E.2d 259, 261 (Ga. Ct. App. 2003).

Defendants make two arguments. First, Defendants argue that the Court should dismiss any false imprisonment claims against Williams because he was not involved in the arrests. In their brief, Plaintiffs concede this point as they omit Williams from their counterarguments. See Dkt. No. [80] at 23. As such, the

---

1983 claim, Youngelson need only look to the common law definition of false arrest, not the state law definition. As such, the Court finds that Youngelson does not need to prove malice for this claim. See Ortega, 85 F.3d at 1525 (defining false arrest under § 1983 as "a warrantless arrest without probable cause.").

[17] In their brief, Defendants seem to suggest they had probable cause to detain Youngelson for obstruction. See Dkt. No. [72-1] at 30 ("Both Plaintiffs were loud, boisterous, cursing, and *attempting to impede the inspection.*") (emphasis added). However, the undisputed facts show that Defendants detained Youngelson for disorderly conduct. Dkt. No. [80-6] at 4 ("[Youngelson] was detained for disorderly conduct after he was loud, boisterous, continued to use profanity."). Nowhere in the After Action report does it say Youngelson was detained for obstruction or for attempting to impede officers. Id. As such, the Court will not analyze whether Defendants had probable cause to detain Youngelson for obstruction.

Court **GRANTS** Defendants' Motion for Summary Judgment as to Williams for Youngelson's federal false imprisonment claim.

Next, Defendants argue that the Court should dismiss Youngelson's claim as to the remaining Defendants. Specifically, Defendants argue that, based on their professional skill and judgment, Rapier and Brannon determined that there was probable cause to detain Youngelson for disorderly conduct.

Youngelson counters that, because his actions during the raid do not fit the definition of disorderly conduct under the DeKalb County ordinance, Defendants could not have had probable cause to detain him. The ordinance says, "it shall be unlawful for any person to act in a loud and boisterous, reckless, unruly or violent manner for the purpose of insulting, degrading or inciting another or a group of individuals in a public place." DEKALB CO., GA., CODE art. III, § 16-58.

Youngelson argues that the encounter that led to his detention occurred in the private, employee-only area of the club. Because the ordinance requires the inciting behavior to occur in a public space, Youngelson argues a reasonable officer would not believe he had probable cause to arrest Youngelson under the circumstances. Additionally, Youngelson argues that he did not say anything insulting or degrading to Rapier or Brannon or do anything to incite another group of people. Instead, Youngelson claims he merely asked the officers why they were raiding his establishment.

27

Defendants, however, claim Youngelson *was* insulting and degrading to the officers. [18] Therefore, there remains a question of fact for the jury to determine whether Rapier and Brannon had probable cause to arrest Youngelson for disorderly conduct. As such, the Court must **DENY** Defendants' Motion for Summary Judgment for Youngelson's § 1983 false imprisonment claim.

Schindler's false arrest claim presents nearly identical issues of law. To prevail, Schindler must show that Defendant Rutland and Defendant Brannon lacked probable cause to arrest him for disorderly conduct under the ordinance. Kingsland, 382 F.2d at 1226 (citing Marx v. Gumbinner, 905 F.2d 1503, 1505 (11th Cir. 1990)).

As mentioned above, the ordinance prohibits a person from acting "in a loud and boisterous, reckless, unruly or violent manner for the purpose of insulting, degrading or inciting another or a group of individuals in a public place." DEKALB CO., GA., CODE art. III, § 16-58. Defendants claim that Schindler was cursing at officers and acting loudly and boisterously. Additionally, it is undisputed that when told to "back down," Schindler did not initially step away. However, he did so a few moments later.

---

[18] Importantly, Defendants do not use qualified immunity as a defense to this false imprisonment claim. While they ask the Court to dismiss all of Plaintiffs' Fourth Amendment claims on the basis of qualified immunity, their arguments only concern *Follies'* Fourth Amendment claim for unreasonable search and seizure and the individual Plaintiffs' excessive force claims. There is nothing in their summary judgment brief to demonstrate why they deserve qualified immunity for Youngelson's false imprisonment claim. The issues presented in each federal claim are so distinct that the Court cannot assume Defendants meant for their argument to cover all federal claims.

28

Schindler, on the other hand, claims he was calm and obeyed all orders. And while he admits that he did not initially back away, he says he only did so because he was shocked by the command, not because he intended to impede the raid.

Because it is currently disputed whether Schindler was yelling or cursing, the question for the Court is whether his undisputed failure to immediately back away gave Defendants probable cause to arrest him for disorderly conduct as a matter of law. The Court finds that merely hesitating to obey an instruction does not necessarily amount to loud or boisterous behavior, nor does it necessarily show that Schindler was trying to incite individuals to act against the officers. Therefore, taking the facts in a light most favorable to Schindler, a question of fact remains as to whether Defendants had probable cause to arrest him for disorderly conduct.

Defendant Rutland, in his own brief, claims that, even if he lacked probable cause, he is immune from liability through qualified immunity.[19] Because the facts, taken in a light most favorable to Plaintiffs, demonstrate a constitutional violation, the question for the Court is whether the violation was clearly established. See Pearson, 555 U.S. at 236 (defining the two-pronged analysis as (1) whether there was a constitutional violating, and (2) whether that violation

---

[19] Defendant Rutland filed his own Motion for Summary Judgment. Dkt. No. [73]. And while he properly asserted a qualified immunity defense as to *all* federal claims, the other Defendants failed to do so. See *infra* pg. 28. Therefore, the following qualified immunity analysis only applies to Defendant Rutland and the arguments he posited in his brief.

was clearly established). Rutland claims the violation was not clearly established because "there is no law that makes Schindler's arrest patently unlawful under the circumstance." Dkt. No. [73-1] at 13.

The Court disagrees. The Eleventh Circuit has clearly established that "an arrest made without probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures." Skop v. City of Atlanta, 485 F.3d 1130, 1143 (11th Cir. 2007). While the Eleventh Circuit does not require an officer to show probable cause to gain qualified immunity, the facts must demonstrate *arguable* probable cause at the time of the arrest. Id. at 1137. ("We do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause.")

Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the defendants could have believed that probable cause existed to arrest plaintiff." Id. at 1144. While this is a lower standard than probable cause, the Court does not find that Schindler's brief hesitation, without more, constitutes arguable probable cause as a matter of law.

This is especially true given the elements of disorderly conduct as defined by the ordinance. See generally id. at 1138 ("Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime."). The ordinance focuses on unruly, loud, inciting, and boisterous behavior. DEKALB CO., GA., CODE art. III, § 16-58. Schindler's *undisputed* behavior, in hesitating to obey a command, does not fit the

ordinance.[20] As such, the Court finds that there is a question of fact as to whether Rutland lacked arguable probable cause such that he is not entitled to qualified immunity. Therefore, the Court **DENIES** Defendants' Motions for Summary Judgment as to Rutland and Brannon on Schindler's false arrest claim.

### ii. State Law Claims

Plaintiffs bring a number of state law claims against Defendants. Both Youngelson and Schindler bring claims for false imprisonment in violation of O.C.G.A. § 51-7-20 and assault and battery in violation of O.C.G.A. § 51-1-13 and § 51-1-14. Schindler brings a separate claim for malicious prosecution in violation of O.C.G.A. § 51-7-40. However, Defendants successfully argue they are immune from each state law claim based on official immunity.

Under Georgia law, claims against a public officer acting in his official capacity are barred by the doctrine of official immunity unless the officer "(1) negligently performed a *ministerial* duty, or (2) acted with actual malice or an actual intent to cause injury while performing a *discretionary* duty." Lincoln Cty. v. Edmond, 501 S.E.2d 38, 41 (Ga. Ct. App. 1998) (emphasis in original). It is undisputed that the choices made by Defendants were part of their discretionary

---

[20] While Schindler's disputed conduct of yelling a cursing might establish arguable probable cause, the Court can only consider the undisputed facts when assessing a motion for summary judgment. See FED. R. CIV. P. 56(a).

duty. Therefore, the question for the Court is whether the record shows Defendants acted with actual malice.[21] See Id.

In the context of official immunity, "actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact." Marshall v. Browning, 712 S.E.2d 71, 74 (Ga. Ct. App. 2011). Importantly, "[a]ctual malice does not include implied malice, or the reckless disregard for the rights and safety of others." Id. (citation omitted).

Defendants argue that the record is devoid of any evidence that Defendants acted with actual malice towards Youngelson or Schindler. And Plaintiffs fail to argue that such evidence exists because they erroneously assert the standard is willful and wanton disregard.

However, even if Plaintiffs argued the correct standard, the Court agrees that there is nothing in the record to indicate actual malice. While Defendants may have recklessly disregarded Youngelson and Schindler's rights against false imprisonment, there is no evidence showing that they set out to violate Plaintiffs' rights specifically. And while Plaintiffs may have received scrapes and bruises,

---

[21] Plaintiffs contend that actual malice is not the current standard for official immunity. Instead, they claim the Georgia Supreme Court, in Gilbert v. Richardson, 440 S.E.2d 684 (Ga. 1994), only requires willful or wanton disregard. However, Plaintiffs misread the court's language.

In the opinion, the Georgia Supreme Court begins its discussion by recounting the development of the official immunity doctrine. Id. at 752. It points out that, before its codification in the Georgia Constitution, the standard was willful and wanton disregard. Id. However, the court goes on to recite the *new* standard as actual malice. Id. at 752-53 ("state officers . . . are subject to suit only when . . . they act with *actual malice* or intent to cause injury.") (emphasis added). Therefore, the Court will proceed under an actual malice standard.

those injuries do not show actual malice and are in line with the arresting officer's "right to use some degree of physical coercion" while making an arrest. Tittle v. Corso, 569 S.E.2d 873, 863 (Ga. Ct. App. 2002). And lastly, while Rutland may not have had probable cause to make the arrest and institute the prosecution against Schindler, his actions do not demonstrate a "deliberate intention to do wrong" for the purposes of malicious prosecution. See Marshall, 712 S.E.2d at 74. Therefore, the Court **GRANTS** Defendants' Motions for Summary Judgment as to all state law claims.

## IV.   CONCLUSION

In accordance with the foregoing, the Court **DENIES** Defendants' Motions for Summary Judgment as to DeKalb County for Follies' unreasonable search and seizure claim, as to Defendant Rutland and Brannon for Schindler's false arrest claim under § 1983, and as to Defendant Rapier and Brannon for Youngelson's false imprisonment claim under § 1983. The Court **GRANTS** Summary Judgment as to all Defendants for Follies' prior restraint claim, as to all Defendants for Youngelson and Schindler's excessive force claims, as to Williams for Youngelson's false imprisonment claim under § 1983, as to all individual Defendants for Follies' unreasonable search and seizure claim, and as to all Defendants for Youngelson and Schindler's state law claims.

**IT IS SO ORDERED** this 13th day of January, 2016.


LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE