[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10490
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-00253-LMM

WBY, INC.,
d.b.a. Follies,
JOSHUA SCHINDLER,
STEVE YOUNGELSON,

                                                  Plaintiffs-Appellees,

versus

DEKALB COUNTY, GEORGIA, et al.,

                                                  Defendants,

JEFFERY RUTLAND,

                                                  Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 16, 2017)

Before MARCUS, ROSENBAUM, and FAY, Circuit Judges.

PER CURIAM:

Defendant-Appellant Jeffrey Rutland, a lieutenant with the DeKalb County Police Department, appeals the district court's order denying him qualified immunity from Plaintiff-Appellee Joshua Schindler's 42 U.S.C. § 1983 claim for wrongful arrest in violation of the Fourth Amendment. After careful review, we affirm the denial of qualified immunity.

## I. Background

This case arises out of a police raid conducted by the DeKalb County Police Department at Follies, an adult entertainment club, on April 19, 2013. The raid allegedly was a "business check" for the purpose of ensuring Follies's compliance with the DeKalb County Code. This appeal narrow focuses on an interaction in the Follies parking lot between Rutland, one of the officers on the scene, and Schindler, who worked as a valet at Follies.[1]

Schindler works for "Valet for Life," a valet car-parking company that had a contract with Follies for valet services. When customers pull up to the valet "staging" area in the Follies parking lot across from the front doors, Schindler accepts the valet fee, gives a ticket to the driver, and then parks the car.

---

[1] Schindler brought his claims jointly with Follies and its owner, Steve Youngelson, who challenged the constitutionality of the raid itself, among other matters. Only Schindler's § 1983 wrongful-arrest claim is at issue in this appeal.

2

On the day of the raid, Schindler was working his valet shift, preparing to park a car that was in the staging area, when police officers drove into the parking lot in a grey van, a black SUV, and several other marked and unmarked police cars. The unmarked grey van pulled up directly behind the car where Schindler was standing. Just after the van pulled up, Schindler began walking back towards the front entrance of Follies, where the valet podium was located. Meanwhile, numerous officers had exited the vehicles and were heading into Follies. As depicted in the security footage[2] below, Schindler (in khaki pants and a black long-sleeved shirt by the silver car near the top-middle) was walking towards the front entrance of Follies behind two of the police officers, while the other officers approached Follies from the side. Rutland is at the top left of the picture.



---

[2] The images in this opinion are screenshots from Follies's security footage that have been cropped to highlight the relevant details. The security footage does not have audio.

As Schindler walked back towards the valet podium, Rutland, who was near a police vehicle off to Schindler's right, approached him, began yelling for him to "back down," and demanded to know what he was doing. Rutland testified that he believed Schindler was attempting to interfere with the officers who were entering Follies. Schindler stopped, turned towards Rutland, and told him that he was a valet and that he did not understand what was going on.

Rutland came up extremely close to Schindler, standing between him and the front entrance, and again yelled at Schindler to "back down." Schindler reiterated that he was a valet and asked why Rutland, who was "extremely lived," was taking such an aggressive tone with him. Schindler testified that he did not understand what Rutland meant by "back down," though he eventually took one step backwards from Rutland (top-right picture below) and put his hands out low and to his sides in a placating gesture. Rutland stepped forward and put his hand on Schindler's arm, while Schindler turned away from Follies. Another officer (in the blue shirt) immediately ran over and helped Rutland take Schindler to the ground.[3] Schindler's hands were zip-tied behind his back, and he was detained for the remainder of the raid.

---

[3] Rutland insists that the other officer, not Rutland, initiated the arrest, but the video is ambiguous on the matter, and a reasonable jury could infer that Rutland at least participated in Schindler's arrest.

4



Between stopping at Rutland's request and taking one step backwards, Schindler remained standing in the same location, about one car's length into the parking lot just outside the front entrance. About 12 or 13 seconds elapsed from when Rutland reached Schindler to when Schindler took one step backwards. Schindler testified that he did not say anything to the other officers before Rutland intervened, and that during his encounter with Rutland he did not yell, swear, or respond in anger.

5

After the raid, Schindler was transported to the Dekalb County Detention Center and charged with disorderly conduct. That charge was dismissed for want of prosecution when Rutland and the other officer failed to show up for Schindler's trial date.

After the charges against him were dropped, Schindler brought this civil-rights lawsuit alleging claims of excessive force and false arrest under 42 U.S.C. § 1983 and related state-law claims. Following discovery, Rutland moved for summary judgment and invoked the defense of qualified immunity with regard to the § 1983 claims. Rutland argued that Schindler could not overcome the defense of qualified immunity because there was "no law clearly establishing that Defendant Rutland acted unlawfully . . . in arresting Plaintiff Schindler for disorderly conduct." The extent of Rutland's analysis of Schindler's wrongful-arrest claim is as follows:

> With regard to the arrest of Plaintiff Schindler, the facts are undisputed that Rutland approached Schindler as he appeared to be trying to follow police into the club and asked Schindler multiple times to back away. Schindler admits he did not heed Rutland's instructions but instead refused to back up. Because there is no law that makes Schindler's arrest patently unlawful under this circumstance, Rutland is entitled to qualified immunity and the claims against him should be dismissed on summary judgment.

Responding to Rutland's summary-judgment motion, Schindler argued that Rutland lacked probable cause to arrest for disorderly conduct. In reply, Rutland contended for the first time that, even assuming Schindler was incorrectly charged

with disorderly conduct, the arrest was still objectively valid because a reasonable officer could have believed that Schindler's failure to back away at an officer's command constituted obstruction of an officer under O.C.G.A. § 16-10-24(a).

The district court granted in part and denied in part Rutland's motion for summary judgment. In relevant part, the court denied qualified immunity to Rutland for Schindler's § 1983 wrongful-arrest claim, finding no arguable probable cause to arrest Schindler for disorderly conduct. The court explained that the undisputed facts showed only that Schindler briefly hesitated to obey an instruction, and "merely hesitating to obey an instruction does not necessarily amount to loud or boisterous behavior, nor does it necessarily show that Schindler was trying to incite individuals to act against the officers." The court did not address Rutland's arguments that there was arguable probable cause to arrest for obstruction. Rutland timely appealed the denial of qualified immunity.

## II.  Standard of Review

We review *de novo* a district court's denial of summary judgment on qualified-immunity grounds. *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318 (11th Cir. 2016). Summary judgment is appropriate only when the moving party demonstrates that no disputed issue of material fact exists. *Id.* In reviewing whether summary judgment was appropriate, we must accept the non-movant's version of the facts as true and draw all reasonable inferences in his favor. *Id.* We

do not make credibility determinations or choose between conflicting testimony. *Id.* When a factual conflict exists in the evidence, we credit the non-moving party's version of events. *Id.* Accordingly, the qualified-immunity determination must be based on the plaintiff's version of the facts. *Id.*

### III. Discussion

The defense of qualified immunity protects government officials from individual liability when they are engaged in their job duties unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2013) (brackets and internal quotation marks omitted). Thus, qualified immunity "does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Carter*, 821 F.3d at 1319 (internal quotation marks omitted).

Officials asserting qualified immunity must first establish that they were acting within the scope of their discretionary authority at the time of the alleged misconduct. *Id.* Once they do, the burden shifts to the plaintiff to overcome the defense of qualified immunity by showing "both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." *Id.*

There is no dispute that Rutland was acting within the scope of his discretionary authority as a police officer. So we turn to the questions of whether Rutland violated Schindler's constitutional rights and whether those rights were clearly established.

"[I]t is well established that [a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Carter*, 821 F.3d at 1319 (internal quotation marks omitted). But where probable cause supports an arrest, it bars a § 1983 unlawful-arrest claim. *Id.* "Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal quotation marks omitted). Probable cause determinations are evaluated objectively—that is, without regard to the officer's subjective intentions—and under the totality of the circumstances. *See id.* As a result, "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1195–96 (11th Cir. 2002) (quoting *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992)).

Even if probable cause is lacking, however, an officer is still entitled to qualified immunity if *arguable* probable cause supported the arrest. *Id.* Qualified

9

immunity therefore protects an officer if he reasonably but mistakenly believed that probable cause was present. *Carter*, 821 F.3d at 1319–20. But "[w]here an officer arrests without even arguable probable cause, he violates the arrestee's clearly established Fourth Amendment right to be free from unreasonable seizures." *Id.* at 1320.

A.   ***Rutland's Theory of Probable Cause on Appeal***

On appeal, Rutland abandons any challenge to the district court's conclusion that there was not arguable probable cause to arrest Schindler for disorderly conduct. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not briefed on appeal are abandoned). In any case, even if the issue were properly before us, we agree with the district court that, under Schindler's version of events, arguable probable cause to arrest for disorderly conduct did not exist.

Instead of relying on disorderly conduct, Rutland now charges Schindler with having obstructed an officer under O.C.G.A. § 16-10-24(a). However, Rutland did not sufficiently present his current legal arguments and theories to the district court. In his motion for summary judgment, Rutland never argued that arguable probable cause to arrest for obstruction existed. Rather, he claimed entitlement to qualified immunity because "no law clearly establish[ed] that Defendant Rutland acted unlawfully . . . in arresting Plaintiff Schindler ***for***

10

*disorderly conduct*." Rutland then broadly contended that "there [wa]s no law that makes Schindler's arrest patently unlawful under this circumstance." These statements are not sufficient to "specifically and clearly" identify to the district court that the arrest may have been justified under § 16–10–24(a). *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330–31 (11th Cir. 2004) (any issue that a litigant wants the court to address "should be specifically and clearly identified").

Although Rutland did raise his current theory of probable cause in a reply brief in support of his motion for summary judgment, reply briefs are not a vehicle to present new arguments or theories. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotation marks omitted) (alterations adopted). Because Rutland's current theory of probable cause was raised clearly in his reply brief only, it was within the district court's discretion to decline to address that theory.

Thus, Rutland impermissibly attempts to "argue a different case" from the one he "presented to the district court." *See Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir. 1998). But "theories not raised squarely in the district court cannot be surfaced for the first time on appeal." *Wood v. Milyard*, 132 S. Ct. 1826, 1832 (2012) (internal quotation marks omitted). Since Rutland did not

11

"specifically and clearly" articulate his current theory of qualified immunity to the district court at an appropriate time, we will not address its merits on appeal. *See Access Now*, 385 F.3d at 1330–31. Although we may exercise our discretion to address arguments raised for the first time on appeal, Rutland's case does not implicate the "exceptional conditions" that justify review of newly raised issues, *see id.* at 1332–35 & n.4.

## B. *Rutland is not Entitled to Qualified Immunity*

In any case, even assuming without deciding that the issue is properly before us and that the district court erred by failing to evaluate whether arguable probable cause to arrest Schindler for obstruction an officer existed, *see Lee*, 284 F.3d at 1195–96, Rutland still is not entitled to qualified immunity because, taking the facts in the light most favorable to Schindler, no reasonable officer could have believed that Schindler's conduct constituted obstruction under Georgia law.

Under Georgia law, "a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). "The essential elements of that crime are: (1) knowingly and willingly obstructing or hindering, (2) any law enforcement officer, (3) in the lawful discharge of his official duties." *Larkin v. State*, 495 S.E.2d 605, 606 (Ga. Ct. App. 1998).

Construed in the light most favorable to Schindler, the facts show that Schindler, who was not being detained and who was not suspected of having committed a crime, briefly hesitated to obey Rutland's ambiguous instructions to "back down," after he had already stopped at the officer's request and was standing in the parking lot where he was working as a valet, while attempting to inform the officer that he was the valet and to inquire as to what the officers were doing.

Under these circumstances, Schindler's statements to Rutland alone are not sufficient to constitute obstruction under Georgia law.[4]  Although Georgia courts have held that "words alone can constitute obstruction," the Georgia Court of Appeals in *Harris v. State* reviewed Georgia case law and "found no case upholding an obstruction conviction based solely upon a defendant's act of speaking to, remonstrating with, or even criticizing an officer during the performance of his duties."  726 S.E.2d 455, 458 (Ga. Ct. App. 2012) (noting that deceiving an officer or interfering with an officer's interview of a reporting party may be sufficient to qualify as obstruction).  Rather, there usually must be "words plus something more."  *Id.*  That "something more" may be the defendant's "refus[al] to comply with an officer's directive or command" or the defendant's "threatening or violent" behavior.  *Id.*

---

[4] While Rutland testified that Schindler was yelling and cursing at him and the other officers, Schindler denies doing so.  We must credit Schindler's version of events in making the qualified-immunity determination.  *See Carter*, 821 F.3d at 1318.

13

Schindler's statements here did not even amount to criticism or challenge of the officer, but rather were attempts to disclose information about his identity and to understand why a significant number of officers were conducting a raid at his place of employment. So the statements alone cannot establish arguable probable cause to arrest. *See Skop v. City of Altanta*, 485 F.3d 1130, 1139 (11th Cir. 2007) ("When, as under Skop's version of the facts, an individual . . . simply reiterates or attempts to clarify a perfectly reasonable question directed to the officer, there is neither probable cause nor arguable probable cause to arrest for obstruction."); *Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006) ("Neither an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice or disorderly conduct. Nor can a citizen be precluded by the threat of arrest from asking to speak to an officer's superior or from asking for an officer's badge number. Those inquiries likewise do not constitute obstruction of justice or disorderly conduct.").

Rutland mainly argues that Schindler's repeated refusal to comply with commands to back away from Follies constituted obstruction. Under the facts of this case, construed in Schindler's favor, we disagree.

Initially, we note that Georgia law clearly provides that citizens have no freestanding obligation to comply with a police officer's requests when the officer

14

is not discharging a lawful duty. For example, when an officer detains an individual without reasonable suspicion, the "citizen is free to ignore requests and/or to walk away, and . . . no charge of obstruction [will] lie." *Strickland v. State*, 594 S.E.2d 711, 715–16 (Ga. Ct. App. 2004). In other words, the simple fact that Schindler may have hesitated in complying with Rutland's requests to "back down" is not alone sufficient to show obstruction under the facts of this case. Rather, Schindler's brief hesitation must have obstructed or hindered the lawful discharge of either Rutland's or another officer's official duties. The official duties relevant to this case are the officers' execution of a police operation at Follies. So the question is whether Schindler's conduct hindered or obstructed the execution of those duties.

Construing the facts in the light most favorable to Schindler, we cannot conclude that his brief hesitation in complying with Rutland's command to "back down" was sufficient to supply even arguable probable cause to believe that Schindler obstructed the lawful execution of a legal duty. Schindler's conduct amounted to no more than a "mere failure to immediately respond" to a police officer's orders, which, without more, is insufficient to show obstruction under § 16-10-24(a). *Martinez v. State*, 743 S.E.2d 621, 623 (Ga. Ct. App. 2013); *Coley v. State*, 344 S.E.2d 490, 490 (Ga. Ct. App. 1986).

In *Coley*, for example, an officer was dispatched to investigate a domestic disturbance between the defendant and his wife. 344 S.E.2d at 490. When the officer arrived, the defendant, who was "committing no offense," was walking back towards his pickup truck, the passenger door of which was open. The defendant's wife shouted, "He's got a gun," prompting the officer to order the defendant to move away from the truck. The defendant "did not do so." The officer repeated his order, and the defendant changed tack and began walking towards the house. The officer then twice ordered the defendant to stop. When the defendant did not stop, the officer ran up and conducted an arrest. The Georgia Court of Appeals found nothing in this evidence to support the conclusion that the defendant "obstructed or hindered [the officer] in any way in the performance of his duty." "At most," the court explained, "he did not respond immediately" to the officer's orders. *Id.* And the mere failure "respond immediately" to an officer's orders is "insufficient" to constitute obstruction. *Id.* at 491.

Here, like the defendant in *Coley*, Schindler did "nothing more than fail to respond immediately to [Rutland's] orders."[5] *Id.* At the time that Schindler briefly

---

[5] Rutland argues that the cases Schindler relies upon have all been disapproved or overruled, but, as far as we are able to tell, *Coley* has never been disapproved. Even within one of the cases Rutland cites for the purpose of showing such disapproval, the court did not disapprove of *Coley* and instead distinguished it based on its facts, implicitly recognizing that *Coley* remains good law. *Stryker v. State*, 677 S.E.2d 680, 682–83 (Ga. Ct. App. 2009). Numerous other cases have likewise factually distinguished *Coley* while recognizing the validity of its holding. *See, e.g.*, *Davis v. State*, 706 S.E.2d 710, 717 n.26 (Ga. Ct. App. 2011) (finding *Coley* "inapposite" but citing it for the proposition that a "defendant's mere failure to

hesitated to comply with Rutland's commands to "back down," Schindler was stopped well outside of Follies's front door in the parking lot where he was employed as a valet, he was not being detained nor was he suspected of having committed a crime, he was not interfering with any officer's freedom of movement into or out of Follies, and he was not, as Rutland asserts, "interpos[ing] himself in the middle of the operation," whatever Rutland may have believed about Schindler's initial intentions.  In fact, once he had stopped at Rutland's approach, Schindler made no significant move other than to step backwards.  While Schindler did speak to Rutland, Schindler testified that he was not argumentative or hostile during their brief interaction.  *See id.* at 490.  Accordingly, we see no evidence from which a reasonable officer in Rutland's position could have concluded that Schindler "obstructed or hindered [an officer] in any way in the performance of his duty."  *Id.*

Rutland's reliance on *Mayhew v. State*, 682 S.E.2d 594, 596–98 (Ga. Ct. App. 2009), is misplaced.  The obstructive conduct in that case was not simply

---

immediately follow police orders was insufficient to show obstruction"); *West v. State*, 673 S.E.2d 558, 561 (Ga. Ct. App. 2009) ("In *Coley*, the defendant refused to comply with the officer's orders to move away from a truck and to stop.  We reversed his conviction for obstruction because there was no evidence that the defendant obstructed or hindered the officer, noting that the defendant did not "speak to, or argue with, [the officer]. At most, he did not respond immediately to [the officer's] orders."); *Johnson v. State*, 507 S.E.2d 13, 15 (Ga. Ct. App. 1998) (distinguishing *Coley* and noting that, in *Coley*, "the defendant committed no crime in the officer's presence . . . [,] [n]or did he argue with the officer"); *Reed v. State*, 422 S.E.2d 15, 17–18 (Ga. Ct. App. 1992) (distinguishing *Coley* on its facts).

failing to move back immediately when told to do so. Rather, the defendant in *Mayhew* repeatedly refused to comply with the officer's requests to step back and stop yelling while the officer was attempting to interview another individual as part of the officer's investigation into an emergency call. *See id.* at 596–97. Thus, the defendant's refusal to comply with the officer's repeated requests plainly obstructed the officer's investigation into the emergency call. *Id.* at 598.

In sum, because Schindler's conduct amounted to no more than a failure to respond immediately to Rutland's orders while informing the officer of his status as a valet and questioning what the officers were doing at Follies, it cannot reasonably be construed as obstructing or resisting the exercise of a lawful duty. Accordingly, we affirm the district court's denial of qualified immunity to Rutland on Schindler's § 1983 claim for unlawful arrest.

**AFFIRMED.**

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 16, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 16-10490-DD
Case Style: WBY, Inc., et al v. Jeffery Rutland
District Court Docket No: 1:14-cv-00253-LMM

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Sandra Brasselmon, DD at (404) 335-6181.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs